## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

DAVID O. KRUEGER

         Plaintiff,

vs.                                                        CASE NO: 2:06-cv-465-FtM-29SPC

MICHAEL J. ASTRUE,
Commissioner of Social Security,

         Defendant.

_____

## REPORT AND RECOMMENDATION[1]

_____This matter comes before the Court on the Plaintiff, David O. Krueger's, Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. #1) filed on September 11, 2006.  The Plaintiff filed his Memorandum of Law in Support of the Complaint (Doc. #9) on January 29, 2007. The Commissioner filed a Memorandum of Law in Support of the Commissioner's Decision (Doc. #10) on February 28, 2007.  Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

---

[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

1

## FACTS

### *Procedural History*

The Plaintiff filed an application for a period of disability and disability insurance benefits on March 22, 2000.  (Tr. 20).  The Plaintiff's claim was denied initially and upon reconsideration.  (Tr. 20).  On August 29, 2001, the Plaintiff timely filed a request for hearing.  A hearing was held on November 3, 2003, before the Honorable H. Allen Wagner, Administrative Law Judge (ALJ).  (Tr.20).  The Plaintiff appeared for the hearing with his attorney.   The ALJ issued an unfavorable decision on March 25, 2004.  (Tr. 20-27).  The Plaintiff filed a timely request for review by the Appeals Council.  (Tr. 15).  The Appeals Council subsequently denied the request for review.  (Tr. 9-11).  Having exhausted all administrative remedies, the Plaintiff timely filed a Complaint with this Court.

### *Plaintiff's History*

_____The Plaintiff was born on September 9, 1942, making him fifty (50) years of age on the alleged onset disability date.  (Tr. 21, 57).  The Plaintiff was fifty-four (54) years old on September 30, 1996, the date his insured status expired.  (Tr. 21).   The Plaintiff has three (3) years of college.  The Plaintiff has a past relevant work history as a salesman. (Tr. 21).  The Plaintiff alleges an onset of disability due to the residual effects of cancer radiation treatments, bypass surgery, congestive heart failure, breathing problems and fatigue.  (Tr. 21).

### *Medical and Psychological History*

The Plaintiff has a history of Hodgkin's disease[2], diagnosed in December 1976, which was

---

[2]Hodgkin's Disease is defined as a malignant lymphoma whose pathological hallmark is the Reed-Sternberg bell, a giant, multinucleated cell, usually a transformed B lymphotcyte.  The disease may affect persons of any age but occurs most often in adults in their early 30s.  About 7500 new cases of the disease are

in remission after radiation treatment. (Tr. 625). On October 18, 1991, the Plaintiff presented to the Kaiser Permanente Emergency Room for a consultation. (Tr. 625). The Plaintiff complained of subjective tachycardia[3]. (Tr. 625). The Plaintiff's heart rate was approximately 140. (Tr. 625). The Plaintiff was given Digoxin which reduced the heart rate from 140 to 90. (Tr. 625). The Plaintiff was told to return if he experienced increased heart rate, fever, sweats, and chills. (Tr. 625).

The Plaintiff returned to the emergency room on October 29, 1991, with complaints of heart palpitations. (Tr. 624). The Plaintiff was again diagnosed with atrial fibrillation with unknown etiology. (Tr. 624). The Plaintiff was released with medication. (Tr. 624). The Plaintiff continued to be monitored by Dr. Flaningam through May 1992. (Tr. 624).

On February 25, 1993, the Plaintiff was admitted to the Orlando Regional Healthcare System for atrial fibrillation. (Tr. 554). The Plaintiff underwent quadruple aortocoronary bypass with cardiac catheterization on March 1, 1993. (Tr. 565-566). The Plaintiff tolerated the procedure well. (Tr. 566). The Plaintiff was discharged on March 12, 1993. (Tr. 554).

On April 8, 1993, the Plaintiff presented to the Kaiser Permanente Medical Center in Oakland, California, for an irregular and fast heartbeat. (Tr. 22, 613). The Plaintiff was diagnosed with recurrent atrial fibrillation. (Tr. 613-614). The Plaintiff was treated with medication and released.

On June 22, 1993, the Plaintiff presented to Kaiser Permanente in Oakland, California, with complaints of chest pain. (Tr. 636-656). The Plaintiff was admitted to the medical center with angina

---

diagnosed annually in the U.S.  The lymphoma typically begins in a single lymph node (esp. in the neck, axilla, groin, or near the aorta) and spreads to adjacent nodes if it is not recognized.  It may metastasize gradually to lymphatic tissue on both sides of the diaphragm or disseminate widely to tissues outside the lymph nodes.  *Taber's Cyclopedic Medical Dictionary*, 956 (Donald Menes, M.D. ed., 19th Ed. F.A. Davis 1997) (hereinafter *Taber's*)

[3]Tachycardia is defined as an abnormally rapid heart rate, greater than 100 beats per minute in adults. *Taber's at* 2039.

and held for observation.  (Tr. 636-656).  During the hospital stay, the Plaintiff underwent a series

of tests, including an ECG[4], which yielded abnormal results.  (Tr. 656).  The Plaintiff was treated with

medication and discharged on June 23, 1993.  (Tr. 653).

On March 1, 1993, the Plaintiff underwent a quadruple aortocoronary bypass with Dr. David

Spector.  (Tr. 565).  The Plaintiff tolerated the procedure well and was returned to the heart unit in

stable condition.  (Tr. 566).    The Plaintiff's postoperative diagnosis was coronary artery disease.

(Tr. 565-567).

On March 7, 1993, a chest x-ray was performed on the Plaintiff by Dr. Thomas E. Quinn.

(Tr. 585).  Results showed status postoperative CABG.  (Tr. 585).  There were further resolutions

of congestive change in the lungs compared to the study on March 3, 1993.  (Tr. 585).  There was

persistent consolidation and bibasilar effusions, greater on the left than the right.  (Tr. 585).  Dr.

Quinn's impression noted continued improvement in the ventilation of lungs and resolution of

congestive changes.  (Tr. 585).  Small bibasilar effusions as well as some retrocardiac consolidative

change was present on the examination.  (Tr. 585).  On March 16, 1993, the Plaintiff was examined

by Dr. Flaningam for post operative follow- up.  (Tr. 713-718).  The Plaintiff reported some increased

discomfort.  (Tr. 713).

On April 8, 1993, the Plaintiff presented to the emergency room with a chief complaint of fast,

---

[4]Electrocardiogram, abbreviated ECG, is defined as a record of the
electrical activity of the heart, consisting of waves called P, Q, R, S, T, and
sometimes U.  The first, or P, wave is caused by the depolarization of the atria,
whose electrical changes in turn cause atrial contraction.  The Q, R, and S waves
(QRS complex) correspond to depolarization of ventricular muscle.  The T wave
corresponds to ventricular repolarization.  The electrocardiogram gives important
information concerning the spread of electricity to the different parts of the
heart and is used to diagnose rhythm and conduction disturbances, myocardial
infarction or ischemia, chamber enlargement and metabolic disorders, among
others.  *Taber's* at 647.

irregular heartbeat. (Tr. 613). An ECG was performed but did not show a significant difference in comparison to the test performed on March 1, 1993. (Tr. 613). The diagnosis was atrial fibrillation and the Plaintiff was instructed to take medication, follow up with Dr. Flaningam and return to the emergency room if he became short of breath or experienced chest pain. (Tr. 614). On April 27, 1993, the Plaintiff underwent further examination by Dr. Flannigam for atrial fibrillation. (Tr. 709-710).

On May 11, 1993, the Plaintiff underwent a thallium stress test. (Tr. 707). The results showed there was homogeneous uptake of thallium throughout the myocardium on both the immediate and delayed images. (Tr. 707). Lung to heart thallium activity ratio was calculated to be 40% (upper limits of normal was 30%). (Tr. 707). There were 2mm of ST depression at the inferolateral leads on ECG stress tracing. (Tr. 707). The impression was normal appearing SPECT thallium myocardial perfusion images. (Tr. 707). There was suggestion of exercise induced LV dysfunction with an elevated lung to heart thallium activity ratio as well as symptomatic BP drop immediate post stressing. (Tr. 707).

On June 22, 1993, the Plaintiff returned to the emergency room for chest discomfort. (Tr. 637-656). The Plaintiff reported waking up with chest pain and pressure. (Tr. 647). The Plaintiff took Mylanta and after three (3) hours went to the emergency room. (Tr. 647). The diagnosis was unstable angina and he was admitted to the hospital for observation. (Tr. 647). The Plaintiff reported smoking approximately half a pack of cigarettes a day for about 39 years. (Tr. 644). There were no psychological problems noted and the Plaintiff denied anxiety. (Tr. 646).

On June 23, 1993, the Plaintiff underwent a stress test where he performed six minutes and thirty four (6:34) seconds of exercise on a treadmill. (Tr. 652). The test was stopped due to ST

inferolaterally, but the Plaintiff had no symptoms except fatigue.  (Tr. 649).

On July 23, 1993, the Plaintiff presented to Dr. Flannigam for status post CABG.  (Tr. 701). The Plaintiff had abnormal liver tests but did not complain of more atrial fibrillation.  There was a trace of edema bilaterally in the legs.  (Tr. 701).

On October 19, 1993, the Plaintiff presented to Dr. C. Wilson for treatment of carotid artery disease.  (Tr. 695).  Dr. Wilson notes the Plaintiff's recent bout of pneumonia but no angina like symptoms.  (Tr. 695).

On November 3, 1993, the Plaintiff returned to Dr. Wilson  to wear a holter monitor.  (Tr. 770).  The Plaintiffs average heart rate was 74 BPM, with a minimum rate of 63 BPM  and maximum of 111 BPM. (Tr. 770).  The results showed a sinus rhythm, frequent PVC's, occasional bigeminy, occasional couplet, one triplet, and rare APC's.  (Tr. 770).

From November 1993, through March 1994, Dr. Flaningam continued to examine the Plaintiff.  (Tr. 685-691).  On January 26, 1994, the Plaintiff reported still trying to work but was continuing to have problems including intermittent urinary tract infections, leg edema, impotence, low energy,  and mild depression. (Tr. 691).   On March 17, 2007, the Plaintiff was diagnosed with pneumonia which resolved.  His congestive heart failure improved.  (Tr. 687).  On March 26, 1994, the Plaintiff underwent a resting cardiac scintigraphy.  (Tr. 688).  The impression was normal biventricular function.  (Tr. 688).

Dr. Wilson continued to treat the Plaintiff through August 1994, for coronary artery disease. (Tr. 685).  Dr. Davis performed a carotid examination on the Plaintiff on October 10, 1994. (Tr. 766).  The study showed fibrotic plaquing in the carotid arteries and bilaterally produced 40% common carotid stenosis. (Tr. 766).  There is a 2.7mm shallow ulceration in the plaquing on the right.

6

(Tr. 766).   There was a heterogeneous, non-stenotic plaquing in the internal carotid arteries bilaterally.  (Tr. 766).  The vertebral and subclavian arteries were normal.  (Tr. 766).

The medical records dated after the Plaintiff expiration of his insured status are not summarized herein except as they relate to the period prior to September 30, 1996. The Plaintiff underwent an additional cardiac catheterization and additional  x-rays.   In April 2000, the Plaintiff came under the care of Dr. Tarharka. (Tr. 225-229).

On August 17, 2001, Dr. Taharka dictated a letter regarding the Plaintiff's condition. (Tr. 225-229). Dr. Taharka stated that the Plaintiff was permanently disabled from pulmonary hypertension due to chronic lung disease. (Tr. 225-229).  Dr. Taharka stated the lung disease was progressive, irreversible, and associated with several complications (co-morbid conditions).  (Tr. 225).  Dr. Taharka further stated the limitations from the Plaintiff's pulmonary hypertension and chronic lung disease hindered his daily living activities and prevented him from holding down a job. (Tr. 225).

The Plaintiff was first seen by Dr. Taharka, a Pulmonolgist in April of 2000,  for dyspnea, fatigue, and pulmonary hypertension.  (Tr. 226).  Dr. Taharka opined the causes of his pulmonary hypertension were (1) 1980 chemotherapy and radiation that damaged his lungs when treated for Hodgkins disease, (2) cigarette smoking for over thirty years, and (3)  a 1993 coronary artery bypass resulting in pleural and parenchymal scarring and lung  restriction.  (Tr. 227).  He also developed atrial fibrillation, which led to bouts of congestive heart failure.  (Tr. 227).  An echocardiogram and chest x-ray in 2001 showed severe tricuspid regurgitation, abnormal septal motion due to RV overload, RV enlargement, and RA enlargement.  (Tr. 228).

On August 20, 2003,  Dr.  Joseph Jordan, a treating physician, completed a medical source

statement on the Plaintiff. (Tr. 299-302)  Dr. Jordan opined that the Plaintiff could continuously sit for thirty (30) minutes before alternating positions and could stand in place.  (Tr. 299).  The Plaintiff would need to stand or walk less than fifteen (15) minutes before returning to his position. (Tr. 299).  The total time sitting during an eight (8) hour day, not including time spent standing or walking, was less than an hour.  (Tr. 299).  He could continuously stand or walk for less than  fifteen (15) minutes before changing positions and then could sit in a working position for about thirty (30)  minutes before returning to standing or walking.  (Tr. 300).  He could only stand or walk less than an hour out of an eight (8)  hour day. (Tr. 300).  He needed additional rest time in addition to lunch breaks and morning and afternoon breaks scheduled at two (2) hour intervals.  (Tr. 300).   The Plaintiff could only sit one half (½) hour, stand/walk one half (½)  hour and rest seven (7)  hours out of an eight (8) hour work day.  (Tr. 301).  He could rarely lift one (1)  to five (5) pounds and never lift more than that.  (Tr. 301).  He could rarely balance or stoop and his period of restrictions existed and persisted with the restrictions as outlined since at least June 9, 1995.  (Tr. 302).

On October 21, 2003, Dr. Taharka completed a cardiac physical capacities evaluation on the Plaintiff. (Tr. 328-331).  Dr. Taharka diagnosed the Plaintiff with cardiomyopathy, coronary artery disease, atrial fibrillation, chronic pleural effusion, and pulmonary hypertension.  (Tr. 328). The Plaintiff  could reasonably lift one (1) to five (5) pounds rarely and sit or stand only one half (½) hour in an eight (8)  hour day and would need to lay down seven (7) hours out of an eight (8) hour work day.  Dr. Taharka also opined the Plaintiff's American Heart Association rating was assessed as "Class III" which indicated  marked limitations of physical activity, being comfortable at rest, and that ordinary activity caused fatigue, palpitations, dyspnea, or anginal pain, which was applicable since June 1993.  (Tr. 328).

*Relevant Evidence Submitted to the Appeals Council*

After the ALJ issued his decision, the Plaintiff obtained additional evidence from Kaiser Permanente in California dated from 1992, through December 1996.  On April 6, 1993, Dr. Wilson, a cardiologist, examined the Plaintiff at the request of Dr. Flaningam. (Tr. 828-829).  Examination revealed bilateral carotid bruits that were probably radiating from his aortic area and from his heart area (he had carotid doppler that revealed a 50% stenosis).  Dr. Wilson recommended the Plaintiff not work for one (1) month. (Tr. 828-829)

On August 2, 1994, the Plaintiff again reported shortness of breath after walking one (1) to two (2) blocks.  The Plaintiff had one plus peripheral edema in his extremities and he was diagnosed with mild congestive heart failure. (Tr. 855-856).  Dr. Flaningam continued to treat the Plaintiff during the relevant time period. (Tr. 864-874).  A chest x-ray on July 14, 1995, showed a small left pleural effusion. Dr. Flaningam noted that the Plaintiff's pleural effusion would come and go. He was told to repeat the chest x-ray in four to six weeks. (Tr. 864).  On December 4, 1995, his chest x-ray showed increased pleural effusion. The Plaintiff was diagnosed with recurrent respiratory infection with increased pleural effusion. (Tr. 866). A chest x-ray performed on August 8, 1996, showed partially loculated fluid in the left pleural space that was more impressive than on December 29, 1995. There could also be trapped pleural fluid in the left major fissure creating a pseudo tumor appearance. The right lung was entirely clear and the heart size was normal and stable compared with December 1995.

*Administrative Law Judge's Decision*

Upon consideration of the record, the ALJ found the Plaintiff met the non-disability requirements of the Act on March 3, 1993, the alleged onset disability date,  and continued to meet

them only through September 30, 1996, the date his insured status under Title II of the Act expired. (Tr. 25). The ALJ found no evidence in the record that the Plaintiff engaged in substantial gainful activity since March 3, 1993. (Tr. 26). The ALJ found the Plaintiff had coronary artery disease, an impairment considered "severe" based on the requirement in the Regulations. (Tr. 26). However, the Plaintiff's medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4. (Tr. 26). The ALJ determined the Plaintiff's allegations regarding his limitations resulting from heart disease, including shortness of breath, weakness, and fatigue, are not credible to the disabling extent alleged. (Tr. 26). The ALJ found there was minimal medical evidence in the record from June 1993, to October 1997, to document the severity of the claimant's heart condition and the subjective limitations/restrictions resulting therefrom. (Tr. 26). The ALJ stated that while the Plaintiff alleged shortness of breath, he continued to smoke. (Tr. 26). As noted by the ALJ, the Plaintiff testified that he finally stopped smoking sometime in 2000 or 2001. (Tr. 26). The ALJ stated he carefully considered all of the medical opinions in the record regarding the severity of the Plaintiff's impairments and found that at the time of the expiration of his insured status on September 30, 1996, the Plaintiff retained the residual functional capacity for light work, which involves lifting no more than 20 pounds with frequent lifting or carrying up to 10 pounds. (Tr. 26). The ALJ notes the full range of light work including the following: standing or walking, off and on, for six hours of an eight-hour day, sitting may occur intermittently during the remaining time, occasional stooping is required, and some push/pull arm-hand or leg-foot movement may be necessary. (Tr. 26). The ALJ determined if someone can do light work, he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods. (Tr. 26). On this basis, the ALJ

concluded, the Plaintiff is capable of a full range of light work.  (Tr. 26).  The ALJ further concluded that based upon the testimony of the vocational expert who stated that the claimant's past relevant work as a salesman was light, at the time of the expiration of his insured status on September 30, 1996, the Plaintiff was capable of returning to his past relevant work.  (Tr. 26).  Therefore, the ALJ concluded the Plaintiff was not under a "disability" as defined in the Social Security Act, at any time through September 30, 1996.  (Tr. 26).

## **THE STANDARD OF REVIEW**

### A. **Affirmance**

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards,  McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971).  In evaluating whether a claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations[5].  See 20 C.F.R. §§ 404.1520(a), 404.920(a).  The

---

[5]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability.  The steps are as follows:
     Step 1.  Is the claimant engaged in substantial gainful activity?  If the claimant is engaged in such activity, then he or she is not disabled.  If not, then the ALJ must move on to the next question.
     Step 2.  Does the claimant suffer from a severe impairment?  If not, then the claimant is not disabled.  If there is a severe impairment, the ALJ moves on to step three.
     Step 3.  Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.
     Step 4.  Can the claimant perform his or her former work?  If the claimant can perform his or her past relevant work, he or she is not disabled.  If not, the ALJ must answer the last question.
     Step 5.  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982)); <u>Richardson</u>, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  <u>Edwards v. Sullivan</u>, 937 F.2d 580, 585 n.3 (11th Cir. 1991); <u>Barnes v. Sullivan</u>, 932 F.3d 1356, 1458 (11th Cir. 1991).  The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  <u>Foote</u>, 67 F.3d at 1560; <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court  "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."<u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983).  If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. <u>Lewis v. Callahan</u>, 125 F. 3d 1436, 1440 (11th Cir. 1997).

**B.  <u>Reversal and Remand</u>**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails

to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).

To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards). Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984). (remand was appropriate to allow ALJ to explain the his basis of his decision).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior

13

proceeding. <u>Diorio v. Heckler</u>, 721 F.2d 726, 729 (11th Cir. 1983)(finding ALJ error and remanding to consider psychiatric evaluation); <u>Reeves v. Heckler</u>, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. <u>Jackson</u>, 99 F.3d at1095.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. <u>Jackson</u>, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. <u>Jackson</u>, 99 F.3d at 1090 - 92; <u>Keeton v. Dept. of Health and Human Serv.</u>, 21 F.3d 1064, 1068 (11th Cir. 1994). With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. <u>Jackson</u>, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. <u>Id</u>.

## **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## DISCUSSION

The Plaintiff argues the ALJ erred by (1) failing to consider and discuss the opinion of the Plaintiff's treating physician, Dr. Joseph Jordan and (2) failing to call a medical expert to determine the onset date of disability in accordance with Social Security Regulation 83-20.   The Government argues that the Plaintiff was insured for benefits up to September 30, 1996, and failed to prove disability prior to the date last insured.   Further, the Defendant contends the ALJ's decision was supported by substantial evidence in the record.

### *(1) Whether the ALJ Erred in Failing to Consider the Plaintiff's Treating Physician, Dr. Joseph Jordan*

The Plaintiff argues the ALJ failed to credit the opinion of treating physician, Dr. Joseph Jordan, and did not articulate the reasons for doing so.  The Defendant maintains that the ALJ noted the lack of medical evidence during the relevant time period but considered and rejected the identical opinion of Dr. Ananse Taharka, another physician at Kaiser Permanente Medical Group.   Therefore, the identical opinion of Dr. Jordan was implicitly rejected and a remand on this basis would serve no purpose.

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. 20 C.F.R. § 404.1527 (d); Lewis, 125 F.3d at 1439 - 1441; Sabo v. Commissioner of Social Security, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996).

15

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence, supports a contrary finding, or is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, (11th Cir. 1991) (ALJ properly discounted treating Physician's report where the physician was unsure of the accuracy of his findings and statements); Morrison v. Barnhart, 278 F. Supp. 1331, 1334 (M.D. Fla. 2003). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987); Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. 20 C.F.R. § 404.1527 (d)(2); Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984). Furthermore, should the ALJ discount the treating physician's opinion, he must clearly articulate the reasons for giving less weight to the opinion, and failure to do so is reversible error. Morrison, 278 F. Supp. at1334.

16

On August 20, 2003, Dr. Jordan, who had treated the Plaintiff for four years at that time filed a retrospective diagnosis and opinion, opining that the Defendant's restrictions had continued since June 9, 1995, which was prior to the last date insured.  The ALJ failed to consider Dr. Jordan's, retrospective diagnosis in his decision. "A physician's retrospective diagnosis is a medical opinion of the claimant's impairments which relates back to the covered period." Garvey v. Astrue, 2007 WL 4403525 *7(N.D.Fla. December 12, 2007) (citing Estok v. Apfel, 152 F.3d 636, 639 (7th Cir.1998) (citations omitted)). "A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period." Garvey, 2007 WL 4403525 at *7.  This, it would seem, is simply another way of saying that the opinion of a treating physician need not be given considerable weight if the opinion is inconsistent with or not supported by the contemporaneous medical records. Id.  This does not alter the manner in which the opinion of a treating physician is to be considered. Id. The Eleventh Circuit is especially clear the ALJ must point to substantial evidence in the record to discount the opinion of a treating physician, whether retrospective, contemporary, or prospective. Id.

The ALJ determined, based upon the earning reports of record, the Plaintiff was insured for disability insurance benefits from March 3, 1993, through September 30, 1996.  Therefore, the ALJ was required to determine whether the Plaintiff was disabled on or before September 30, 1996,  the date last insured.  The Commissioner argues that the treating relationship between Dr. Jordan and the Plaintiff was not established until several years after the Plaintiff's date last insured.  Dr. Jordan did not treat the Plaintiff until 1999. Thus, the Commissioner argues the opinion is not relevant.

However, Courts have found that even if the treating physician's initial treatment was not until after the last date insured, the ALJ must discount  the physicians retrospective opinion. *See* Estok,

17

152 F.3d at 639 (remanding for the Commissioner to review the retrospective treating physicians opinion even though the treating physician did not initially treat the Plaintiff until after almost a year after the Plaintiff's last date insured).

The Commissioner also argues that the opinion of Dr. Jordan was the same as Dr. Ananse Taharka also a treating physician and Pulmonologist with the same Kaiser Permanente Group. (Tr. 228-231). In a letter dated September 29, 2003, Dr. Jordan stated the Plaintiff has been under his care with heart related problems for approximately four (4) years. (Tr. 298). On August 20, 2003, Dr. Jordan completed a Medical Source Statement that determined the Plaintiff was only capable of sitting for thirty (30) minutes, standing for fifteen (15) minutes, cumulatively standing or walking for one-half (1/2) hour in an eight (8) hour workday; requiring some extra rest time to relieve fatigue arising from a documented medical impairment, and cumulatively resting for approximately seven (7) hours in an eight (8) hour workday. (Tr. 301). Dr. Jordan opined the Plaintiff's condition existed and persisted with the restrictions since June 9, 1995. (Tr. 302).

On October 21, 2003, a similar or identical opinion was rendered by Dr. Taharka. Dr. Taharka also completed a Cardiac Physical Capacities Evaluation form. (Tr. 328-231). Dr. Taharka opined the Plaintiff was capable of lifting one (1) to five (5) lbs., occasionally, sit for one half (½) hour within an eight (8) hour workday; stand or sit for one half (½) hour within an eight (8) hour workday, and should lay down or rest for seven (7) hours in an eight (8) hour workday. (Tr. 328). Dr. Taharka further opined the Plaintiff required some extra rest time to relieve fatigue arising from a documented medical impairment, and cumulatively resting for approximately seven (7) hours in an eight (8) hour workday. (Tr. 331).

With regard to Dr. Taharka, the ALJ discounted Dr. Taharka for several reasons. First, the

18

ALJ noted the restrictions opined by Dr. Taharka and that these restrictions allegedly existed since June 1993. (Tr. 24). However, as the ALJ states, the restrictions of sitting no more than one half (½) hour or standing no more than one half (½) hour, were totally inconsistent and contradictory to the Plaintiff's own testimony. (Tr. 24). The Plaintiff testified that until the mid-1990's, he traveled by car across the country twice a year. The ALJ went further to state that even if he and his wife started flying sometime in the mid-1990's, such restrictions would still not be reasonable as the Plaintiff would certainly have to sit for more than 30 minutes total in an 8 hour period while they flew across the country. (Tr. 24). The ALJ also pointed out that Dr. Taharka's opinion was not consistent with the totality of the evidence in the record, including the Plaintiff's testimony. Dr. Taharka is a pulmonologist, not a cardiologist and rendered the opinion in 2003, long after the relevant period. (Tr. 24).

Thus, the Commissioner argues the failure to consider Dr. Jordan's diagnosis was harmless error because the ALJ discounted Dr. Taharka's similar opinion. However, the instant case is not one where the unmentioned retrospective opinion supported the ALJ's decision and would thus be unnecessary. Instead Dr. Jordan offered an opinion that conflicts with the ALJ's decision. Even though Dr. Jordan'ss and Dr. Taharka's opinions are similar, it is not the Court, but the ALJ that must make the determination regarding Dr. Jacob's opinion. Indeed, the ALJ "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight and failure to do so is reversible error." Nyberg v. Commissioner, 179 Fed. Appx. 589, 590 (11th Cir. 2006) (citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). As such, it is respectfully recommended that the issue of Dr. Jordan's opinion should be remanded to the Commissioner for due consideration.

### (2) Whether the ALJ was Required to Consult a Medical Advisor to Determine the Plaintiff's Disability Onset Date Pursuant to SSR 83-20

The Plaintiff argues the ALJ erred by failing to apply Social Security Ruling 83-20 to determine the onset disability date. The Defendant argues that the ALJ was not required to consult a medical advisor until the Plaintiff was initially determined to be disabled.

Social Security Ruling 83-20 states that in addition to determining that an individual is disabled, the decision-maker must also establish the onset of disability. Because it may affect the payment of benefits, it is essential that the onset date be correctly established and supported by the evidence. Id.

Once disability is determined, the medical advisor is retained to determine when the condition became disabling for the purpose of awarding benefits. Benjamin v. Apfel, 2000 WL 1375287 (S.D. Ala. 2000). If the ALJ determines that a person was not disabled prior to the expiration of their insured status and that decision is supported by substantial evidence and proper application of the law, then there is no obligation to infer a remote onset date because benefits are not awarded. Id at 7.

Here, the Court is recommending that the case be remanded to the Commissioner for consideration of Dr. Jordan's retrospective opinion. Under such circumstances, the ALJ may or may not have to determine whether or not the Plaintiff was disabled prior to the expiration of his insured status. Should the Commissioner determine that Dr. Jordan's diagnosis is controlling, then a medical advisor's opinion will be needed to determine the disability onset date. Should the Commissioner discount Dr. Jordan's retrospective opinion, then the Commissioner will not be required to call upon a medical advisor.

Accordingly, it is hereby

**RESPECTFULLY RECOMMENDED:**

(1) The decision of the Administrative Law Judge should be **REMANDED** pursuant to 42 U.S.C. § 405(g) sentence four for a determination and explanation by an ALJ regarding the retrospective opinion of Dr. Joseph Jordan.

(2) The Commissioner's decision to not call a medical expert to determine the onset date of disability in accordance with Social Security Regulation 83-20 should be **AFFIRMED** should the Commissioner discount the retrospective opinion of Dr. Jordan.

(3) Should the Commissioner determine that Dr. Jordan's diagnosis is controlling then a medical advisor's opinion will be needed pursuant to Social Security Regulation 83-20 to determine the disability onset date.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** at Fort Myers, Florida, this   5th    day of February, 2008.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  Counsel of record

21